No. 26-3081

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

---

BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES
DIVISION, IBT
*Petitioner*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION

and

FEDERAL RAILROAD ADMINISTRATION
*Respondents*

ASSOCIATION OF AMERICAN RAILROADS
*Intervenor*

---

PETITION FOR REVIEW OF A DECISION OF THE DEPARTMENT OF
TRANSORTATION, FEDERAL RAILROAD ADMINSITRATION

**BRIEF FOR PETITIONER BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION/IBT**

Richard S. Edelman
Mooney, Green, Saindon, Murphy & Welch, P.C.
1620 Eye Street NW, Suite 700
Washington, DC 20006
(202) 783-0010
REdelman@mooneygreen.com

June 15, 2026

## CORPORATE DISCLOSURE STATEMENT

Petitioner, the Brotherhood of Maintenance of Way Employees Division/IBT is a labor organization, and an unincorporated association. Accordingly, BMWED has no corporate parent or affiliates. And BMWED has no shareholders. BMWED's members are railroad workers throughout the United States.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ........ i
TABLE OF CONTENTS ........ ii
TABLE OF AUTHORITIES ........ iii

I. INTRODUCTION ........ 1
II. JURISDICTIONAL STATEMENT ........ 2
III. ISSUES PRESENTED FOR REVIEW ........ 4
IV. STATEMENT OF THE CASE ........ 4
A. Statutory and Regulatory Background ........ 4
1. The Safety Mandate of the Statute and FRA;s Regulatory Authority with Respect to Rail Safety ........ 4
2. Track Safety Standards ........ 5
3. Track Inspection ........ 6
B. Prior Litigation Concerning the FRA's Authorizations of Reductions in Frequencies of Human Track Inspections ........ 7
1. *Brotherhood of Maintenance of Way Employes Division/IBT v. Department of Transportation*, 781 Fed. Appx. 7 (D.C. Cir. 2019); Suspension of The Regulations for a Test regarding use of track inspection machines ........ 7
2. *BNSF Ry. Co. v. Federal R.R. Admin.*, 62 F. 4th 905 (5th Cir. 2023); FRA's Denial of a Waiver of 49 C.F.R. §213.233 (b) and (c) for two BNSF Lines ........ 8
C. AAR's 2025 Petition for a Waiver for Its Member Railroads ........ 11
D. BMWED's Comments in Response to AAR's Petition ........ 13
1. BMWED's Evidence as to What Track Inspectors Do ........ 14
2. BMWED's Evidence as to What Track Geometry Machines Can and Cannot Do ........ 15
3. BMWED's Response to AAR's Reliance on Experience from the Test Programs and Waivers ........ 16
4. BMWED's Evidence and Responses to the Issue of Safety of Track Inspectors ........ 17

5. BMWED's Evidence Regarding the Delays in Remediation of Defects as a Result of Reduction in Frequency of Human Track Inspections ..... 18

E. AAR's Supplemental Filing ..... 20

F. BMWED's Rebuttal to AAR's Supplemental Filing ..... 22

G. FRA's Decision ..... 26

V. SUMMARY OF ARGUMENT ..... 29

VI. ARGUMENT ..... 30

A. FRA Decisions Are Reviewed by the Courts of Appeals Under the Hobbs Act and Are Overturned if the Decisions Are Arbitrary or Capricious ..... 30

B. Rail Safety is the FRA's Highest Priority, Its Statutory Mandate is to Enhance Safety; and Waivers of Safety Regulations May Only be Granted if They Are in the Public Interest and Consistent With Railroad Safety ..... 34

C. FRA's Decision Should Be Vacated as Contrary to the FRSA ..... 34

D. The FRA's Decision Should Be Vacated as Arbitrary and Capricious Because the Agency Failed to Provide a Reasoned Explanation for Its Decision ..... 37

E. FRA's Decision Should Be Vacated as Arbitrary and Capricious Because the Agency Failed to Address Significant Facts and Arguments Raised by BMWED ..... 42

F. FRA's Decision Should Be Vacated as Arbitrary and Capricious Because the Permitted Delay in Remediation of Defects is Contrary to FRA's Own Regulations ..... 47

VII. CONCLUSION ..... 49

CERTIFICATE OF SERVICE ..... 50

CERTIFICATE OF COMPLIANCE ..... 51

# TABLE OF AUTHORITIES

## CASES

**Page**

*BNSF Ry. Co. v. Federal R.R. Admin.*,
62 F. 4th 905 (5th Cir. 2023) ........................................................ *passim*

*BNSF Ry. Co. v. Federal R.R. Admin.*,
105 F. 4th 691 (5th Cir 2024) ........................................................ 10, 11, 33, 47

*BNSF Ry. v. United States Dep't of Transp.*,
566 F 3d 200 (D.C. Cir. 2009) ........................................................ 30

*Brotherhood of Locomotive Engineers and Trainmen et al. v. Federal R.R. Admin.*,
972 F. 3d 83 (D.C. Cir. 2020) ........................................................ 30, 31, 34, 41

*Brotherhood of Maintenance of Way Employes Division/IBT v. Department of Transportation,*
781 Fed. Appx. 7 (D.C. Cir. 2019) ........................................................ 7, 30

*Butte County v. Hogan,*
613 F. 3d 190 (D.C. Cir. 2011) ........................................................ 32

*Cincinnati Bell Tel. Co. v.* FCC,
69 F.3d 752 (6th Cir. 1995) ........................................................ 32, 33, 37

*Communications & Control, Inc. v. FCC,*
374 F. 3d 1329 (D.C. Cir. 2004) ........................................................ 32

*Encino Motorcars LLC v. Hector Navarro,*
579 U.S. 211 (2016) ........................................................ 30

*Environmentel, LLC v. Federal Communications Comm.*,
661 F. 3d 80 (D.C. Cir. 2011) ........................................................ 31, 33, 41, 48

*Fox Television Stations, Inc. v. FCC*,
280 F.3d 1027 (D.C. Cir. 2002) ........................................................ 33, 37

*Golden Living Ctr. – Mountain View v. HHS*,
832 Fed. App'x 967 (6th Cir. 2020) ........................................................... 31, 40

*Henry Ford Health Sys. v. Shalala*,
233 F.3d 907 (6th Cir. 2000) ........................................................................ 32

*Interstate Commerce Comm. v. B'hood of Locomotive Engineers*,
482 U.S. 270 (1987) .................................................................................... 30

*Kakar v. U.S. Citizenship & Immigration Services,*
29 F. 4th 129 (2d Cir. 2022) .................................................................. 33, 37

*Ligon Specialized Hauler Inc. v. Interstate Commerce Commission*,
587 F. 2d 304 (6th Cir. 1978) ...................................................................... 30

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .................................................................................... 36

*Meister v. USDA*,
623 F.3d 363 (6th Cir. 2010) ........................................................................ 32

*Mfrs. Ry. Co. v. Surface Transp. Bd.*,
676 F.3d 1094 (D.C. Cir. 2012) ........................................................... 32, 33, 47

*Moctezuma-Reyes v. Garland*,
124 F.4th 415 (6th Cir. 2024) ...................................................................... 34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Automobile Insurance Co., et. al,*
463 U.S. 29, 43 (1983) ...................................................................... 31, 33, 40, 47

*Nat'l Envt'l Dev. Ass'n's Clean Air Project v. EPA*,
752 F. 3d 999 (D.C. Cir. 2014) ........................................................... 32, 33, 48

*Norfolk Southern Ry. v. U.S. Dept. of Labor*,
2022 US App. Lexis 33326 (6th Cir. 2022) .................................................... 33

*Ohio Telecom Ass'n v. FCC,*
150 F 4th 694 (6th Cir. 2025) .............................................................. 30

*Pickens v. Hamilton-Ryker IT Sols., LLC,*
133 F.4th 575 (6th Cir. 2025) .............................................................. 35

*Policy and Research, LLC v. United States Department of Health and Human Services, et al.*,
313 F. Supp.3d 62 (2018) .............................................................. 32

*Safari Club International v. Zinke,*
878 F.3d 316 (D.C. Cir. 2017) .............................................................. 32

*Tourus Records, Inc. v. Drug Enforcement Administration,*
259 F.3d 731 (D.C. Cir. 2001) .............................................................. 31

*United Transp. Union v. Foster,*
205 F. 3d 851 (5th Cir 2000) .............................................................. 4, 34

*Wilson v. Comm'r of Soc. Sec.*,
378 F.3d 541 (6th Cir. 2004) .............................................................. 33, 48

## STATUTES AND REGULATIONS

28 U.S.C. §2342 .............................................................. 4, 30

28 U.S.C. §2344 .............................................................. 4

49 C.F.R §1.89 .............................................................. 5

49 C.F.R.§211 .............................................................. 7, 8

49 C.F.R. §213 .............................................................. *passim*

49 U.S.C. §103 .............................................................. 4, 34

49 U.S.C. § 20101 .............................................................. 4, 34

49 U.S.C. §20103 .......................................................................................... 2, 4, 34

49 U.S.C. §20114 ................................................................................................... 4

## I. INTRODUCTION

The Brotherhood of Maintenance of Way Employes Division/IBT ("BMWED" or "Union") requests that this Court vacate a decision of the Federal Railroad Administration ("FRA" or "Agency") that partially granted a waiver of a railroad track safety regulation requested by the Association of American Railroads ("AAR"). The waiver allows railroads to reduce the frequency of railroad Track Inspector inspections of most track from eight times per month to four times per month, so long as they comply with certain conditions, primarily: 1) the railroads deploy automated track geometry inspection machines that assess track only for one of several classes of track defects once per month, 2) they comply with certain reporting requirements, 3) track geometry defects detected by a machine are remedied within 24 hours of verification by a Track Inspector, and 4) track geometry defects remain at or below specified levels.

BMWED submits that FRA's decision is not in accordance with the Agency's enabling statute that directs the FRA to make railroad safety its highest priority and waive safety regulations only when a waiver is in the public interest and consistent with railroad safety. BMWED further contends that the decision is arbitrary and capricious because Agency failed to provide a reasoned explanation for its decision, failed to address significant facts and arguments raised by BMWED showing that the waiver is inconsistent with rail safety, and because the

decision is contrary to the Agency's own regulations that require immediate remediation of track defects.

BMWED respectfully requests that the Court hear oral argument in this case because the issues involve rail safety throughout the United States, and the FRA has repeatedly failed to satisfy basic administrative law requirements in issuing decisions on rail safety issues. BMWED also believes that since a decision in this case will involve consideration of a number of technical railroad engineering issues, the Court will benefit from oral argument.

## II. JURISDICTIONAL STATEMENT

The FRA issues railroad track safety regulations pursuant to its authority under 49 U.S.C. §20103 to prescribe railroad safety regulations. One of those regulations requires human visual inspection of railroad track (on foot or by vehicle) at certain minimally required frequencies depending on the "class" (speed level) of the track, and for Track Inspectors to take immediate remedial actions for defects they observe. 49 C.F.R. §213.233. Under 49 U.S.C. §20103(d)(1), the Secretary of Transportation may waive a rail safety regulation if the waiver "is in the public interest and consistent with railroad safety".

On April 24, 2925, the AAR, petitioned the FRA for a waiver of the regulations specifying the frequency of human visual track inspections and immediacy of defect remediation. AAR requested a waiver that would allow its

member railroads to reduce the frequency of human track inspections to 25% of the regulation mandated frequency for most track, and to substitute once-a-month track geometry machine inspections for several of the eliminated human inspections. Joint Appendix ("J.A.") at 7. If AAR's petition was granted, most track would change from at least eight Track Inspector inspections per month to two Track Inspector inspections and one track geometry machine inspection per month.[1]

BMWED, the representative of railroad employees who perform track inspections and railroad employees who traverse and work on the tracks of AAR member railroads, submitted comments, statements of track inspectors, and documents in opposition to the petition. Weeks after the close of the comment period AAR submitted additional information in support of its petition; BMWED responded to that submission.

FRA granted AAR's waiver petition in part and imposed conditions on use of the waiver by decision dated December 5, 2025 (J.A. at 219); railroads were allowed to reduce the frequencies of human track inspections on most tracks by

[1] Track geometry generally includes assessment of the positions of the rails that comprise a track, such as the gauge (distance between rails), and alignment (relative height of the two rails). Track geometry is one of four categories of track and right of way conditions that are governed by FRA safety regulations and must be evaluated by Track Inspectors; the others are track structure, roadbed and drainage, and appliances and devices. These categories, the nature of the inspections, and the differences between geometry and non-geometry defects are described in detail the Declaration of BMWED Director of Safety Roy Morrison, III that was provided with BMWED's Comments to the FRA. J.A. at 54-60.

50%. That decision constituted final action by FRA on AAR's petition. BMWED sought review of FRA's decision by petition for review filed in this Court on February 2, 2026. J.A. at 219-221.

This Court has jurisdiction to review the FRA's decision under the Hobbs Act pursuant to 49 U.S.C. §20114 and 28 U.S.C. §2342. BMWED's petition for review was timely filed under 28 U.S.C. §2344.

## III. ISSUE PRESENTED FOR REVIEW

BMWED respectfully submits that the issue presented for review is:

> Whether the FRA's decision should be vacated as not in accordance with Federal Railroad Safety Act; and as arbitrary and capricious because the Agency failed to provide a reasoned explanation for its decision, failed to address significant facts and arguments raised by BMWED, and the decision is contrary to FRA's own regulations requiring immediate remediation of defects.

## IV. STATEMENT OF THE CASE

### A. Statutory and Regulatory Background

#### 1. The Safety Mandate of the Statute and FRA's Regulatory Authority With Respect to Rail Safety

Congress enacted the Federal Railroad Safety Act ("FRSA") "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents". 49 U.S.C. § 20101. *See also United Transp. Union v. Foster,* 205 F. 3d 851, 859 (5th Cir 2000), *quoting* Section 20101. The statute expressly mandates that the FRA must make safety its highest priority. 49 U.S.C. §103(c) provides:

> Safety as Highest Priority.—
> In carrying out its duties, the Administration shall consider the assignment and maintenance of safety as the highest priority, recognizing the clear intent, encouragement, and dedication of Congress to the furtherance of the highest degree of safety in railroad transportation.

The FRSA authorizes the Secretary of Transportation to issue railroad safety regulations. 49 U.S.C. §20103. That authority has been delegated to the FRA (49 C.F.R §1.89(a), and it has been exercised in part by prescribing railroad Track Safety Standards at 49 C.F.R. §213.

**2. Track Safety Standards**

The Track Safety Standards ("TSS") "prescribe[] minimum safety requirements for railroad track that is part of the general railroad system of transportation". 49 C.F.R.§213.1. TSS regulation Section 213.233(a) (49 C.F.R. §213.233(a)) requires that railroad track inspections must be performed by a person who is designated as qualified to perform track inspection under 49 CFR §213.7, which, in turn, requires that a qualified track inspector must demonstrate that he or she knows and understands all requirements of Section 213.7 that apply to the inspection of the track for which he or she is responsible. TSS Section 213.233(b) and (c) require visual inspections by Track Inspectors at specified frequencies. Section 213.233(b) requires that mainline tracks be visually inspected by vehicle or on foot at least once every two weeks, and sidings at least once a month. Under Section 213.233(c), track rated for higher speeds including most

main line track used by the major railroads (Class 4 and 5 tracks) must be inspected twice weekly; main line track rated for lower speeds and rail sidings not used for passenger service and lower amounts of freight traffic (Class 1, 2 and 3 tracks) must be inspected once weekly; "excepted" and even lower speed tracks must be inspected monthly. Additionally, Section 213.233(d) requires that if a Track Inspector finds a defect, the Inspector is to "immediately initiate remedial action" to correct or safely compensate for the defect(s). 49 C.F.R. §213.233(d).

**3. Track Inspection**

To perform an adequate track inspection under Section 213.233, all of the following items must be inspected: Roadbed (for drainage and vegetation); Track Geometry (for track gauge [width], alignment [consistent positioning of rails], and curves); Track Surface (combined track alignment and surface deviations); Track Structure (for defective or inadequate ballast, crossties, defective rails, rail joints, tie plates and rail fastening systems, and switches); automotive or railroad crossings at grade; and right of way (for overgrown vegetation that might obscure sightlines, and for trespassers, suspicious items, vandalism). A qualified Track Inspector is expected to look simultaneously for all of these sorts of issues, and to consider whether deviations or deformities in these categories that might not individually be defects, cumulatively constitute conditions that must be remedied. J.A. at 20-24, 54-59.

**B. Prior Litigation Concerning the FRA's Authorizations of Reductions in Frequencies of Human Track Inspections**

**1. *Brotherhood of Maintenance of Way Employes Division/IBT v. Department of Transportation*, 781 Fed. Appx. 7 (D.C. Cir. 2019); Suspension of The Regulations for a Test regarding use of track inspection machines**

In 2018, the FRA suspended the regulation governing the frequency of human visual track inspections for a specified section of BNSF Ry. track so that BNSF could test automated track inspection technologies on rail lines in Nebraska and Wyoming. The suspension was pursuant to 49 C.F.R.§211.51 which allows suspension of a track safety regulation in order to conduct a test, provided, among other things, suspension of the regulation is "necessary" to performance of the test, and the test is subject to conditions that will assure safety.

The FRA's decision stated that the agency found that suspension of the regulation was necessary to test automated track inspection technologies, and that the test would be conditioned to assure safety. After BMWED filed a petition for reconsideration, the FRA explained that the Test was actually to assess various combinations of human and machine inspections and that it was necessary to permit less frequent track inspections than otherwise required by Section 213.233(c) in order to determine the optimal combination of visual and automated track inspections. *Brotherhood of Maintenance of Way Employes Division/IBT v. Department of Transportation*, 781 Fed. Appx. 7, 9-10 (D.C. Cir. 2019).

BMWED sought review of the FRA's decision in the D.C. Circuit which

denied BMWED's petition. The Court of Appeals found that the FRA had determined that it is not possible to test the effectiveness of new combinations of human visual and automated inspections at different frequencies without suspending the regulation governing the minimum frequency of inspections by Track Inspectors. The D.C. Circuit concluded that the "FRA has reasonably explained why the temporary suspension is "necessary" to accomplish the purposes of the Test Program". *Id.* The Court held that the agency's decision was rational because different combinations of man and machine inspections could not be tested without temporarily suspending the regulation mandating a minimum frequency of track inspections, and that the agency's decision included conditions sufficient to assure safety during the test as required by the regulation governing suspensions of regulations for test programs (49 C.F.R. § 211.51). *Id.*

**2. *BNSF Ry. Co. v. Federal R.R. Admin.*, 62 F. 4th 905 (5th Cir. 2023); FRA's Denial of a Waiver of 49 C.F.R. §213.233 (b) and (c) for two BNSF Lines**

After completion of the BNSF test program, BNSF sought a waiver of the regulations mandating minimum frequencies of human visual track inspections for two of its lines. FRA found that the machine inspections identified significantly more track geometry defects than Track Inspectors, and concluded that reducing the frequency of human inspections reduced their presence on the tracks and thus reduced their exposure to on-track injuries. Based on those findings, FRA granted BNSF a waiver for the two lines, subject to specified conditions and requirements

that allowed BNSF to reduce frequency of human track inspections, and to supplement the reduced number of human inspections with machine inspections on those lines. *BNSF Ry. Co. v. Federal R.R. Admin.*, 62 F. 4th 905, 909 (5th Cir. 2023). In its waiver decision, FRA indicated that if BNSF successfully implemented the waiver, the railroad could petition to include other lines under the waiver. Following accumulation of data on the waiver territories, BNSF petitioned for expansion of the waiver, but FRA denied BNSF's petition. The Agency noted that its Railroad Safety Advisory Committee ("RSAC") had been tasked with developing industry-wide standards for use of machine inspections and with determining an optimal approach to combining human and machine inspections; FRA concluded that "short circuiting this evaluation process on individual railroads is not in the public interest and consistent with railroad safety at this time". *Id*. at 909-910.

BNSF sought judicial review of FRA's decision and the Court of Appeals for the 5th Circuit granted the petition and remanded the matter to the FRA. The 5th Circuit noted that agency actions must be "reasonable and reasonably explained", and found that "the agency has barely articulated any basis at all" for its decision denying expansion of the waiver. The Court concluded that "[t]he paucity of reasoning is especially glaring in the face of the agency's statutory mandate to prioritize safety". 62 F. 4th at 911. The Court noted that BNSF had made

"evidence-based" claims that the use of the machines was safer and more efficient than visual inspection alone and that the experience under the prior waiver had been deemed successful, so "FRA is duty- bound to provide further justification for its rejection of the technology's expansion". *Id*. at 911.

On remand, FRA again denied BNSF's request for an expanded waiver. The Agency again relied on the RSAC process; but the Court found reliance on the RSAC to be arbitrary because the RSAC had completed its work without reaching consensus. *BNSF Ry. Co. v. Federal R.R. Admin.*, 105 F. 4th 691, 699 (5th Cir 2024)). The Court also rejected FRA's conclusion that BNSF had not shown that the waiver would improve rail safety, because the statutory standard is not whether a waiver improve rail safety, but whether it would be consistent with rail safety. *Id.* FRA also expressed concern that the machines do not detect various types of track defects and safety problems, but the Court noted that FRA had not found that a problem in deciding grant the initial waiver, and FRA had not explained why it reached a different conclusion on remand. *Id*. at 700. Finally, the Court noted that in the initial waiver, FRA had said that if certain conditions were met, BNSF could obtain an expanded waiver and FRA did not dispute that those conditions had been satisfied. The Court concluded that the Agency had effectively pre-determined that an expansion of the waiver would be granted if the initial waiver was successful, that BNSF had a valid reliance interest in an expanded waiver; and that FRA had

not provided an explanation as to why BNSF was not entitled to expansion of the waiver in accordance with the prior FRA decision. *Id.* at 700-701.

**C. AAR's 2025 Petition for a Waiver for Its Member Railroads**

On April 24, 2025, the AAR filed a petition with the FRA seeking a waiver applicable to all its member railroads that would allow them to reduce the frequencies of human track inspections required by 49 C.F.R. §213.233(b) and (c) and to substitute machine inspections for some of the eliminated human inspections. J.A. at 7-12. The petition totaled 6 pages (single-spaced) in length and only one and a half of those pages were devoted to offering justifications for the requested waiver; the remainder of the petition described conditions and procedures the AAR railroads were willing to accept in connection with the waiver. AAR noted that the tests of use of the machines with accompanying reduction in frequency of human track inspections had shown that the machines are "far superior to the human eye in identifying certain types of defects in railroad tracks", known as track geometry defects, and citing findings in the D. C. Circuit and 5th Circuit decisions as to the superiority of the machines in detecting track geometry defects. J.A. at 7. AAR asserted that the "primary benefit of using automated inspection technologies is earlier detection of track defects enabling railroads to switch from reactive to preventive maintenance", whereas "[a] strictly visual approach to inspections results in defects only being addressed when they

become apparent to an inspector observing the track". J.A. at 7-8.

AAR also asserted that use of the machines with reduced use of Track Inspectors provides a safety benefit by reducing potential injuries to employees since they would [assertedly] be spending less time on the tracks. J.A. at 8. AAR also contended that the waiver would provide an additional benefit of improvement in the rail network's efficiency because track defects would be identified and remedied more quickly, which would reduce service interruptions, and track time for track inspection vehicles used by Inspectors would be reduced, both of which would increase the capacity and fluidity of the network. J.A. at 8. AAR requested that on tracks where certain machine detected defects remained below specified levels, and the railroad performed at least one machine inspection per month, the required frequency of human track inspection could be reduced to twice a month for main line tracks and sidings and once a month for other tracks; reducing the required frequency of human track inspections by 75% (from 8 times per month for Class 4 and 5 tracks and from 4 times per month to once per month for other tracks). J.A. at 8. AAR also requested when a machine detects a defect, the railroads would be allowed up to 72 hours to remedy a "single-class" defect, and 48 hours to remedy a "multi-class" defect. J.A. at 9. The remainder of AAR's petition set forth AAR's proposed conditions for the waiver it requested. J.A. at 8-12.

**D. BMWED's Comments In Response to AAR's petition**

BMWED's Comments in opposition to AAR's petition noted that the Union supported increased use of track geometry machines because the machines can identify track geometry problems before they can become detectable by the human eye. J.A. at 17. But BMWED argued that AAR's petition did not seek authority to increase use of the machines (no such authority would be necessary as no regulation prohibits or limits use of the machines), but rather sought to reduced the frequency of human track inspections, and AAR had not shown that decreased human track inspections was consistent with rail safety. J.A. at 37-39. BMWED contended that such a reduction would be inconsistent with rail safety and contrary the FRA's statutory mandate. J.A. at 15-16, 37-44. The Union's Comments were supported by the declaration of BMWED Director of Safety Roy Morrison (a former Track Inspector) J.A. at 53-99, and declarations of about 70 Track Inspectors. *See* Certified Index, item #25, Exhibits 1-8.

BMWED's Comments described the work and responsibilities of Track Inspectors, and what they actually do on a day-to-day basis; explained what track geometry machines can and cannot do, and their personal experiences with the machines missing defects and unsafe conditions. BMWED's Comments also discussed experience and data from the tests and waivers previously authorized by FRA. BMWED noted that AAR's assertion that granting the requested waiver will

improve the rail network's efficiency or reduce congestion was not relevant to FRA's consideration of AAR's petition, which necessarily had to turn on rail safety concerns only. J.A. at 36. The Union argued that FRA should deny AAR's waiver request.

**1. BMWED's Evidence as to What Track Inspectors Do**

As explained in BMWEDs' comments, Track Inspectors perform their duties through hands-on, visual, and tactile inspection of the track and right-of-way by walking or driving over tracks; they assess drainage, track hardware, shifts in ballast [rock material between rail ties that stabilize the ties] and the structural integrity of the right-of-way. They inspect mainline and yard tracks for a wide range of defects such as cracked joint bars [that join two rails], sun kinks [heat induced uplifts of rails], misaligned frogs [a rail switch component], fouled ballast, deterioration of rail ties, broken rails, vertical wear, and switch malfunctions. J.A. at 19, 58-59. The work of Track Inspectors involves not just detection of defects and potential defects, but assessment of unsafe and potentially unsafe conditions when all track and right-of-way components are considered together. J.A. at 21, 58-59. Additionally, as required by 49 CFR §213.233(d), Track Inspectors "immediately initiate remedial action" to redress defects and ameliorate unsafe conditions (which the machines cannot do), typically by initiating emergency

repairs, imposing slow orders [reducing the speed rating for a section of track], or taking sections of track out of service. J.A. at 23-24, 64-69.

**2. BMWED's Evidence as to What Track Geometry Machines Can and Cannot Do**

The Union explained that while the machines are very good at evaluation track geometry, evaluating track geometry is only one aspect of track inspection; and the machines do not, and cannot, detect track structure, roadbed, mechanical and appliances problems, or environmental hazards that are part of a required track inspection. J.A. at 25-26, 59-61. Individual Track Inspectors not only described the technical limitations of the machines, they also explained that they personally inspected track after the machines traversed that same track and they found defects and safety hazards that the machines missed. J.A. at 60-61. Specific examples of the machines missing defects and unsafe conditions were provided by numerous Track Inspectors. J.A. at 27-29.

BMWED also reviewed data on FRA-reported derailments between January 2014 and November 2024 and noted that of the1,284 mainline track-caused derailments during that period, 725 (56.5% of the total) involved non-track geometry conditions such as derailments caused by broken rails, roadbed instability, misaligned switches, damaged frogs, and other structural or operational failures outside the detection capabilities of the track geometry machines. J.A. at 29-30, 61, 71-72, 97-98.

### 3. BMWED's Response to AAR's Reliance on Experience from the Test Programs and Waivers

In response to AAR's reliance on data from the test/pilot programs and waivers that the machines identify many more track geometry defects than Track Inspectors, the Union noted that the question before the FRA was not whether the machines do a superior job at identifying track geometry defects, but whether reducing the frequency of human inspection is consistent with rail safety. J.A. at 31-32, 37-40, 46. BMWED demonstrated that data from the test/pilot programs and waivers did not provide answers that supported AAR's petition. Among other things, the Union observed that the data from the tests and waivers did not show that the railroads actually reduced the frequency of human inspections to anything near the 75% reduction they sought in their petition. J.A. at 31-32, 69-71. On BNSF's pilot lines, the railroad implemented a partial reduction under highly controlled conditions with ongoing human oversight, overlapping technologies, and close FRA monitoring. J.A. at 31-32, 69-70. Human visual safety inspections were never removed entirely, nor were they reduced to the minimal levels proposed by AAR. J.A. at 31-32, 169-70. BMWED cited as examples data for July 2022, the pilot minimum requirement was only 29,160 miles of human inspections, but BNSF conducted over 70,000, in October 2022, the pilot minimum requirement was 18,689 miles, but over 51,000 miles were inspected. BMWED showed that prior to CSX Transportation's test, the railroad conducted three human

visual inspections per week, one more than FRA regulations require, during the test, CSXT merely reduced its human visual inspections to the two inspections per week required by the regulations; and Norfolk Southern Ry. reduced its human inspections to once a week during only part of the test period. And Union Pacific, Canadian National, and Canadian Pacific never reduced human track inspections to the frequencies proposed in their test plans. J.A. at 31-32, 70-71.

**4. BMWED's Evidence and Responses to the Issue of Safety of Track Inspectors**

BMWED argued that while the railroads claimed that reducing the frequency of human track inspections is consistent with rail safety because it supposedly reduces the risk of injury to Track Inspectors since they would allegedly be on the tracks less often, the railroads never provided any evidence that reducing the frequency of human track inspections enhances their safety. J.A. at 33. The railroads described work on the tracks as dangerous and argued that reducing the frequency of human track inspections therefore improves worker safety. But BMWED explained that that does not actually show that the Track Inspectors would be more safe if the frequency of inspections was reduced. BMWED observed that AAR offered no data from the tests/pilot programs that the safety of Track Inspectors was improved during those tests and waivers. J.A. at 33, 72-75, 167-169.

Additionally, BMWED pointed out that because Track Inspectors are track workers, if they are assigned to verifying possible defects identified by the machines, they will still be on the tracks, just at other locations; and if they are reassigned to other maintenance of way jobs, they will still be on the tracks. J.A. at 33, 72-75, 168. BMWED asserted that reducing the number of mandated human safety inspections does not eliminate the presence of workers on or near tracks; and it removes one of the only activities explicitly tied to defect detection and proactive hazard mitigation, which enhances the safety of track workers. J.A. at 33, 72-75. BMWED also explained that when the Inspectors follow proper protocols, and the railroads adhere to those protocols, the Inspectors should not be unsafe on the tracks; they should have exclusive occupancy when they are performing their jobs. J.A. at 33-34, 168. The statements of the Track Inspectors themselves explained that they do not believe that their work is inherently unsafe or that reducing the frequency of their track inspections will make them more safe at work. J.A. at 34-35.

**5. BMWD's Evidence Regarding the Delays in Remediation of Defects as a Result of Reduction in Frequency of Human Track Inspections**

As noted above, while the Track Safety regulations require a Track Inspector to immediately remedy a defect (49 C.F.R. § Section 213.233(d)), AAR's petition requested that the railroads be allowed up to 72 hours to remedy a "single-class" defect, and 48 hours to remedy a "multi-class" defect, detected by a machine.

BMWED demonstrated that with Track Inspectors typically inspecting track twice a week, at most, a defect would be addressed within 3 days of occurrence, and immediately upon detection. J.A. at 27-28, 64-66. The Track Inspectors explained that they either fix what they find when they find it (*e.g.* by installing missing bolts or spikes), they call in a local gang to make a more complicated repair, or they place a slow order or even close the line until a repair can be made. J.A. at 23-24. The Track Inspectors provided specific examples of situations where they implemented immediate remedies and explained the potential hazards had they not been there to contemporaneously address the problems. J.A. at 24, 65.

BMWED further demonstrated that under the railroads' proposal, at best, defects that would have been immediately repaired when detected by a Track Inspector, might not be repaired for 48 or 72 hours when detected by a machine; but the delay in addressing defects would likely be even greater because in addition to increasing the time for remediation, the frequency of human track inspection would be reduced from twice a week to twice a month (or once a week to once a month), and the machine would only be required to be deployed once a month. So a defect that would have been identified and immediately remedied during twice weekly Track Inspector inspections might not be remedied for a week in a regime of twice monthly human inspections and once monthly machine inspections. BMWED provided an example of a line that had been inspected twice a week

going to being inspected twice a month on the 7th and 28th, with the machine coming through on the 14th. With reduced frequencies of human track inspections, a defect that the Track Inspector would have found on the 2nd would not be seen by the Track Inspector until the 7th, and the track segment where the defect would have been found by a Track Inspector on the 9th would not even have a machine traverse it until the 15th, and then the railroad would have another 48 or 72 hours to remedy the problem. So, whereas a Track Inspector would have remedied the problem when it was detected on the 9th, with once-a-month machine inspections and twice-a-month human inspections, a defect that occurred on the 9th might be detected by a machine on the 15th , and then not remedied for another 2 or 3 days for a total of 8 to 9 days after occurrence. J.A. at 40-42, 66-67.

**E. AAR's Supplemental Filing**

Several weeks after the close of the comment period, AAR sought to supplement its petition and respond to BMWED's Comments with additional arguments and data not provided with AAR's petition.

In response to BMWED's showing that the machines detect only track geometry-related defects, AAR asserted that non-track geometry problems eventually show up as geometry deviations that would ultimately be detected by the machines, and that many non-geometry defects are found through special inspections that would continue to occur if the waiver was granted. J.A. at 101-

103. With respect to broken rails, AAR contended that they are rare and generally detected through the signal system, not by Track Inspectors. J.A. at 102.

AAR again cited the successes of the machines in the pilot programs in detecting track geometry defects as justifying the request to reduce the frequency of human track inspections. AAR noted that following the tests, some railroads showed a reduction from 3.08 track geometry defects per 100 miles to 0.24 track geometry defects per 100 miles. The railroads contended that this showed that there is no reduction in rail safety when there are fewer human inspections. J.A. at 100-101. AAR also cited a number of charts that were attached to its supplemental filing in its Appendix A that provided some data collected during the tests. The charts reported findings for the 7 Class I (major) railroads on track geometry defects detected during the pilot programs, numbers of derailments pre- and post-pilot programs (years unspecified), and changes in frequencies of human track inspections on those railroads during the pilot programs. J.A. at 101-105, 119-129. AAR contended that those charts showed the tests were successful because of the number track geometry defects detected increased and the number of derailments decreased while the frequency of human track inspections was reduced. J.A. at 100-101, 103.

With respect to the request for 72 hours to verify and remediate machine identified defects, AAR noted that FRA regulations allowed 72 hours for

verification and remediation of defects found by machines used on higher-speed passenger rail lines. J.A. at 106.

**F. BMWED's Rebuttal To AAR's Supplemental Filing**

BMWED began its response to AAR's supplemental submission by noting that although the issues concerned technical matters such as appropriate frequencies and levels of track inspection, conditions that qualify as track defects, when and how quickly defects need to be remedied, the practical capabilities of track geometry machines, and experience under the pilot programs, and although BMWED submitted statements from about 70 Track Inspectors, AAR's response to BMWED's Comments contained no statement or argument from anyone with track inspection or even track maintenance expertise. BMWED noted that AAR provided no statement from a maintenance supervisor, engineering department official or other qualified rail safety professional, nor did AAR provide statements from any qualified person to rebut the declarations of the Track Inspectors. J.A. at 154, 156-158.

With regard to AAR's assertion that the machines would detect non-track geometry defects because non-track geometry defects would ultimately cause track geometry defects, BMWED responded that non-track geometry defects do not immediately cause track geometry defects; with human track inspections reduced, non-geometry defects could appear and worsen and not be detected until they

became severe enough to also produce measurable geometry deviations, so those non-track geometry defects would not be detected or remedied in as timely a manner as they would be with regular human track inspections. J.A. at 158-159, 197-199. BMWED provided a number of examples of non-geometry conditions where track would be unsafe before the machines would detect a geometry deviation, and identified certain non-geometry defects like switch component failures, frog defects, and fastener failures that might may never produce a detectable geometry defect before causing a derailment. J.A. at 158-159, 197-199. With regard to special inspections catching non-track geometry defects, BMWED explained that special inspections generally occur in specific and extreme situations like washouts after heavy rains; but that many non-geometry defects are not the result of extreme conditions that prompt special inspections. J.A. at 159, 199-200. BMWED also noted that the statements of the Track Inspectors explained that many dangerous conditions occur faster than can be reliably detected through ad hoc special inspections. J.A. at 159.

In response to AAR's assertion that broken rails occur infrequently and are generally detected by the signal system, BMWED explained that signal systems cannot detect every break, particularly if the fracture does not fully interrupt the electrical circuit; and broken rails in "dead zones", like switches, are not detectable by the signal system. J.A. at 159-160, 200-201. BMWED cited the Track

Inspectors statements that showed that, actually, they frequently detect broken rails, and that they have found broken rails after the machines have traversed their tracks. J.A. at 21-22, 27-29, 55, 57. These points were affirmed by additional statements of Track Inspectors who documented their experience with regard to the frequency of finding broken rails, and in finding broken rails missed by the machines. J.A. at 160, 171-174.

In response to the charts at Appendix A to AAR's supplemental filing reporting data accumulated by the seven major railroads during the pilot programs, BMWED noted that AAR data on frequency of human track inspections during different phases of the pilot programs was produced for only four of the seven major railroads(frequencies were permitted to be reduced as the pilots progressed through specified phases), and that AAR did not explain why data from only four of the railroads was produced. J.A. 100-153. Also, while the charts reported how often and how much time inspectors were on the tracks during the tests conducted by different railroads, the charts were inconsistent in terms of data types and methodologies used. J.A. at 163-165, 203-204. The chart for one railroad reported on experience during different phases (with different frequencies of human inspections) without a comparison to pre-test data; a chart for another railroad compared data for different years, and not different phases of the test, and did not indicate when the pilot began or whether or when different phases were

implemented; a third compared two years and not phases of the test and did not indicate when the pilot began or whether or when different phases were implemented; and a fourth reported on only one year, contained an unexplained reference to a particular "subdivision" without explaining the basis for choosing that subdivision and contained unexplained footnotes. J.A. at 163, 204. And the data from one railroad did not show reductions in the frequencies of human track inspections; but purported to show how "exposures" would decrease if the frequency of human track inspections would decrease, based on data from an unspecified "year". J.A. at 163-164.

BMWED also noted that the data the railroads did provide showed that the railroads did not come close to the sort of reductions in the frequencies in human track inspections sought by AAR; that the railroads for which data was reported showed reduced frequencies of human track inspections from about 15% to 25%; far from the 75% reduction in visual inspections AAR sought in its petition. J.A. at 164, 204.

With regard to AAR's reference to the 72 hour time frame allowed for verification and remediation of machine identified defects for higher speed passenger rail corridors, BMWED explained that for those corridors, in addition to the machine inspections, the minimum frequencies of human visual inspections were retained, so a 72 hour delay in verifying machine identified deviations, when

the track is still being inspected by Track Inspectors at regular frequencies was not the same as allowing a 72 hour delay on lines where the frequency of human inspections would be reduced by up to 75%. J.A. at 165-167, 204-205.

**G. FRA's Decision**

On December 5, 2025, FRA issued a decision "partially granting AAR's request". J.A. at 207. The Agency described AAR's request; documented several years of discussion and debate about the value of using automated track inspection machines and the history of its authorization of test programs and waivers related to use of the machines; and noted the filing of comments of various parties as well as AAR's supplemental submission and BMWED's rebuttal. The Agency then reported that its Railroad Safety Board "determined that partially granting AAR's request by modifying the conditions and expanding the scope to include more railroads will allow the demonstration of the effectiveness of expanded TGMS testing in conjunction with a uniform level of reduced visual inspection is in the public interest and consistent with railroad safety". J.A. at 210.

The remainder of the decision set forth conditions attached to the waiver of Section 213.233(b) and (c). J.A. at 210-218. Among other things, FRA required that railroads provide notice to the Agency of their invocation of the waiver along with certain information about the tracks involved, historical data for those tracks and technical information about the machines to be used, and to provide training

for Track Inspectors. J.A. at 210-211.

With respect to reductions in the frequencies of human track inspections, FRA said that such inspections “may be reduced from twice weekly to once weekly” and that machine inspections “must be performed at least monthly on all main tracks and sidings”. J.A. at 211. The Agency noted that once-a-week visual inspection “was the most common of the Test Programs and should be demonstrated widely before further reductions are considered. FRA will evaluate the results of the Waiver after the first year to determine whether further reduction in visual inspections is appropriate”. J.A. at 216.

Regarding responding to defects detected by the machines, FRA directed that “Railroads must protect all multiclass drop TGMS defects upon notification and must protect all TGMS defects within 24 hours of notification”; notification was defined as “when an individual trained and qualified by the railroad reviews and validates the TGMS data. The railroad must review and validate the TGMS data promptly and without unreasonable delay that might pose a heightened safety risk”. J.A. at 212. FRA defined a TGMS defect as “a geometry condition that requires a one or more class drop in speed to bring the condition into compliance with the Track Safety Standards”, and a multiclass drop defect as “a geometry condition that requires a two or more class drop to bring the condition into compliance with the TSS”. FRA said that this “remediation timeline” was

consistent with the condition attached to the BNSF waiver and the Agency "has not seen any issues with BNSF meeting those timelines and has not been presented with justification to lengthen these timelines". J.A. at 215.

In addition to the required conditions, FRA provided that "railroads may elect to collect data on and demonstrate whether (1) TGMS results in earlier detection and remediation of track defects, (2) a reduction in inspector injuries resulting from reduced visual inspections, or (3) TGMS and reduced inspections improve operational efficiency, as described in AAR's waiver request". J.A. at 213.

FRA noted that AAR had asserted that the waiver "is in the public interest and consistent with railroad safety because it will result in earlier detection and remediation of track defects, reduce visual inspections that are a potential source of injury and improve operational efficiency. FRA needs data to confirm these specific conclusions and the waiver will provide an opportunity for the railroads to demonstrate each of these benefits". FRA said this information "will allow FRA to collect and analyze data to evaluate FRA's assertions". J.A. at 216. The railroads were directed to propose and define metrics to quantify each of the benefits asserted in the petition. J.A. at 216-217. With respect to the asserted benefit of injury reduction, the metrics proposed would be required "to show a relationship between the visual inspections and injuries.... If railroads are unable to connect the

reduction in visual inspections to a reduction in injury rates, it would not be considered a benefit of the waiver." J.A. at 217.

FRA declared that the waiver would expire in five years, but that it could be extended if a request was made at least six months prior to the expiration date; and that the Agency reserved the right to rescind the waiver "upon receipt of information pertain to the safety of railroad operations or in the event of non-compliance with any condition of this waiver". J.A. at 217.

## V. SUMMARY OF ARGUMENT

FRA's decision partially waiving the Track Safety Standards as to the required frequency of human track inspections and the necessity for immediate remediation of track defects should be vacated as contrary to the FRSA and as arbitrary and capricious. Although the FRSA directs FRA to make railroad safety its highest priority, and to only waive its safety regulations if a waiver would be in the public interest and consistent with railroad safety, FRA allowed the railroads to dramatically reduce the frequency of human track inspections, a key component of rail safety, and the Agency did so despite BMWED's evidence and argument showing that the reductions authorized by the waiver would reduce rail safety.

Furthermore, the Agency failed to provide a reasoned explanation for its decision; it provided no explanation at all, just a conclusory statement that the waiver complied with the statutory requirements for waivers. The decision is also

arbitrary and capricious because FRA failed to address significant facts and arguments raised by BMWED, showing that the waiver is not in the public interest and not consistent with rail safety. Additionally, FRA's decision is contrary to the Agency's own regulations that require that track defects be remediated immediately upon detection.

## VI. ARGUMENT

### A. FRA Decisions Are Reviewed by the Courts of Appeals Under the Hobbs Act and Are Overturned if the Decisions Are Arbitrary or Capricious

FRA decisions are subject to challenge under the Hobbs Act, 28 U.S.C. §2342. *See* 49 U.S.C. §20114. Hobbs Act standards are essentially the same as those of the Administrative Procedure Act, under which agency actions are overturned if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". *Interstate Commerce Comm. v. B'hood of Locomotive Engineers*, 482 U.S. 270, 282 (1987); *Ohio Telecom Ass'n v. FCC,* 150 F 4th 694, 706-707 (6th Cir. 2025); *Ligon Specialized Hauler Inc. v. Interstate Commerce Commission*, 587 F. 2d 304, 314 (6th Cir. 1978); *BNSF Ry. v. United States Dep't of Transp*., 566 F 3d 200, 203 (D.C. Cir. 2009); *Brotherhood of Locomotive Engineers and Trainmen et al. v. Federal R.R. Admin*., 972 F. 3d 83, 115 (D.C. Cir. 2020); *Brotherhood of Maintenance of Way Employes Division/IBT v. Department of Transportation*, 781 Fed Appx. 7, 9, (D.C. Cir. 2019).

When reviewing an agency action or decision challenged as arbitrary or

capricious, a court must determine whether the agency has "examine[d] the relevant data, and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made"; and whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment". *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Automobile Insurance Co., et. al,* 463 U.S. 29, 43 (1983) (citations omitted); *Encino Motorcars LLC v. Hector Navarro,* 579 U.S. 211, 224 (2016); *Brotherhood of Locomotive Engineers and Trainmen v. FRA, supra*., 972 F. 3d at 115 (citation omitted)—"the APA requires agencies to reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach".

This Court has held that to withstand review, an agency's decision must provide a "reasoned explanation" for the conclusion it reached. *Golden Living Ctr. – Mountain View v. HHS*, 832 Fed. App'x 967, 974 (6th Cir. 2020). *See also*, *Tourus Records, Inc. v. Drug Enforcement Administration,* 259 F.3d 731, 737 (D.C. Cir. 2001)--an agency must "'set forth its reasons' for its decision; an agency's failure to do so constitutes arbitrary and capricious agency action"; *Environmentel, LLC v. Federal Communications Comm.*, 661 F. 3d 80, 84-85 (D.C. Cir. 2011)(citations omitted, brackets in original)– a reviewing court must determine "whether 'the agency examine[d] the relevant data and articulate[d] a

satisfactory explanation for its action including a rational connection between the facts found and the choice made'"; *BNSF Ry. v. Federal R.R. Admin.,* 62 F. 4th 905, 910 (5th Cir. 2023); *Butte County v. Hogan,* 613 F. 3d 190, 194 (D.C. Cir. 2011)(citations omitted) –"The agency's statement must be one of 'reasoning'; it must not be just a 'conclusion'; it must 'articulate a satisfactory explanation' for its action"; *Policy and Research, LLC v. United States Department of Health and Human Services, et al.*, 313 F. Supp.3d 62, 72 (2018)(*citing Communications & Control, Inc. v. FCC,* 374 F. 3d 1329, 1335-36 (D.C. Cir. 2004))–"a conclusion accompanied by 'no explanation; is the epitome of 'arbitrary and capricious decision-making'"; *Mfrs. Ry. Co. v. Surface Transp. Bd.*, 676 F.3d 1094, 1097 (D.C. Cir. 2012).

Additionally, an agency's decision must not be counter to the evidence presented (*Meister v. USDA*, 623 F.3d 363, 371 (6th Cir. 2010)); it must consider factors Congress intended it to consider, and not rely on factors Congress has not intended it to consider (*Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 911 (6th Cir. 2000)); and an agency cannot entirely fail to consider an important aspect of the problem. *Cincinnati Bell Tel. Co. v.* FCC, 69 F.3d 752, 761 (6th Cir. 1995). *See also* -- *Safari Club International v. Zinke,* 878 F.3d 316, 325 (D.C. Cir. 2017) (citation omitted, brackets in original)--a reviewing court should assess "whether the agency 'has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency".

An agency decision that ignores crucial facts in the record or arguments raised by parties is properly vacated as arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm, supra.,* 463 U.S. at 48; *BNSF Ry v. Fed. R.R. Admin.*, 105 F.4th 691, 700 (5th Cir. 2024); *Cincinnati Bell v.* FCC, 69 F.3d at 761; *Kakar v. U.S. Citizenship & Immigration Services,* 29 F. 4th 129*,* 134 (2d Cir. 2022); *Mfrs. Ry. Co. v. STB*, *supra.,* 676 F.3d at 1097; *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1051 (D.C. Cir. 2002).

Furthermore, "it is an elemental principle of administrative law that agencies are bound to follow their own regulations." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004); *Norfolk Southern Ry. v. U.S. Dept. of Labor*, 2022 US App. Lexis 33326 (6th Cir. 2022); *Nat'l Envt'l Dev. Ass'n's Clean Air Project v. EPA*, 752 F. 3d 999, 1009 (D.C. Cir. 2014)—"[a]n agency is not free to ignore or violate its regulations while they remain in effect... an agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations'"; *Environmentel v. FCC, supra.,* 661 F. 3d at 85– an agency 'must comply with its own regulations'".

**B. Rail Safety is the FRA's Highest Priority, Its Statutory Mandate is to Enhance Safety; and Waivers of Safety Regulations May Only be Granted if They Are in the Public Interest and Consistent With Railroad Safety**

The FRA's founding purpose is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents". 49 U.S.C. §20101; *United Transp. Union v. Foster*, 205 F.3d 851, 859 (5th Cir. 2000); *Brotherhood of Locomotive Engineers and Trainmen v. FRA, supra.,* 972 F. 3d at 88; *BNSF Ry v. FRA,* supra., 62 F 4th at 911. Furthermore, the statute that created the Agency mandates that FRA must make safety its highest priority. 49 U.S.C. §103(c) provides:

> Safety as Highest Priority—
>
> In carrying out its duties, the Administration shall consider the assignment and maintenance of safety as the highest priority, recognizing the clear intent, encouragement, and dedication of Congress to the furtherance of the highest degree of safety in railroad transportation.

And in granting waivers of regulations, the statute requires that the Agency ensure that a waiver is consistent with rail safety and in the public interest. Section 20103(d)(1) of the Act, 49 U.S.C. §20103(d)(1), provides:

> The Secretary of Transportation may waive, or suspend the requirement to comply with, any part of a regulation prescribed or an order issued under this chapter if such waiver or suspension is in the public interest and consistent with railroad safety.

**C. FRA's Decision Should Be Vacated as Contrary to the FRSA**

Although the FRSA requires that FRA make safety its highest priority and

that it waive safety regulations only if a waiver would be in the public interest and consistent with railroad safety, FRA granted a waiver that would reduce the frequency of Track Inspector inspections of track and right of way, when such inspections are key to ensuring that train movements across the country are safe. That FRA conditioned the reduced level of inspections on the addition of once-a-month machine inspections does not mean that the reduction in human track inspections is consistent with railroad safety or the FRSA's charge to the Agency. While it is undisputed that the machines do an excellent job of assessing track geometry, that is only one component of an inspection to ensure track safety, and the Agency has allowed a dramatic reduction in the frequency of the human inspections that detect other types of defects and are a linchpin in ensuring safe rail operations.

Not only is the decision problematic on its face, BMWED provided substantial evidence and argument as to why reducing the frequency of human track inspections was not consistent with rail safety or in the public interest. In the Declaration of BMWED Director of Safety Morrison (a former Track Inspector), and in the declarations of individual Track Inspectors, BMWED demonstrated that while the track geometry machines are very good at detecting track geometry defects, they cannot inspect the track and right of way for other defects and hazards that could render the track unsafe. J.A. at 25-30. BMWED also showed that, for the

period between 2014 and 2024, 56.5% of mainline track-caused derailments involved non-track geometry conditions such as broken rails, roadbed instability, misaligned switches, damaged switch frogs, and other structural or operational failures outside the detection capabilities of the track geometry machines. J.A. at 29-30, 61, 71-72, 97-98. The Track Inspectors also explained that there are sometimes multiple track and right-of-way conditions that might not separately be considered defects, that the machines would not identify as defects, but a Track Inspector would flag as cumulatively creating unsafe conditions. J.A. at 21, 25-26, 57-59. The Track Inspectors also provided evidence that they have inspected track that had recently been traversed by a machine and they found that the machine missed significant track and right of way defects. J.A. at 27-29, 60-160, and 171-174.

Given the directives of the FRSA, the Agency's decision to allow the railroads to reduce the frequency of human track inspections was not in accordance with law.[2]

---

[2] To the extent the FRA might contend that its interpretation and application of the FRSA is entitled to deference, such an argument would be foreclosed by the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 395 (2024). *See also, Moctezuma-Reyes v. Garland*, 124 F.4th 415, 421 (6th Cir. 2024); *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587-88 (6th Cir. 2025).

**D. The FRA's Decision Should Be Vacated as Arbitrary and Capricious Because the Agency Failed to Provide a Reasoned Explanation for Its Decision**

Regardless of whether the FRA's decision is clearly contrary to the FRSA, the Agency provided no reasoned explanation for its decision to allow a reduction in the frequency of human track inspections; the Agency showed no rational connection between the facts, the mandates of its enabling statute, and the choice it made. After summarizing AAR's petition, describing the impasse reached by the RSAC and noting the comments submitted by various parties, as well as AAR's supplemental filing and BMWED's rebuttal (J.A. at 207-210), FRA simply stated that it was "partially granting" AAR's petition. The paragraph of the decision announcing its conclusion was as follows:

> FRA's Railroad Safety Board (Board) reviewed the petition, public comments received, and the results of FRA's investigation and analysis. The Board determined that partially granting AAR's request by modifying the conditions and expanding the scope to include more railroads will allow the demonstration of the effectiveness of expanded TGMS testing in conjunction with a uniform level of reduced visual inspection and is in the public interest and consistent with railroad safety. Accordingly, the Board grants the waiver, subject to the following conditions:….

J. A. at 210, footnote omitted.

AAR's petition was "partially granted" in that instead of allowing a reduction in the frequency of human track inspections from 8 times a month to twice a month, a reduction to 4 times a month was allowed. And instead of allowing railroads 48 or 72 hours to remedy a defect detected by a machine,

railroads were allowed 24 hours after verification of the defect by a Track Inspector to remedy a defect detected by a machine. J. A. at 210. In explaining why a 50% reduction in the frequency of human track inspections was allowed, rather than the 75% reduction sought by AAR, FRA said that "This frequency was the most common of the Test Programs and should be demonstrated widely before further reductions are considered. FRA will evaluate the results of the Waiver after the first year to determine whether further reduction in visual inspections is appropriate". J.A. at 216. With respect to the period allowed for remediation of machine detected defects, FRA said that the time period it selected was "in line with BNSF's ATI waiver. FRA has not seen any issues with BNSF meeting these timelines and has not been presented with a justification to lengthen these timelines". J.A. at 216. That was extent of the reasoning provided by the Agency.

At no point did FRA explain why any reduction in the frequency of human track inspection was compatible with its mandate to make railroad safety its highest priority. And while the Agency used the words of the statute: "in the public interest and consistent with railroad safety"; in announcing its decision, it offered no explanation for that conclusion. Again, the question was not whether to allow increased use of track geometry inspection machines, as no FRA authorization was required for that; the question was whether reducing the frequency of human track inspections, a key foundation of safe rail operations, was in the public interest and

consistent with railroad safety. The Agency offered no answer to that question; only the conclusory assertion that the statutory standard was satisfied.

To the extent FRA offered any explanation for its decision it did so only in stating why it was not granting the AAR's request in its entirety; not as to why it believed reducing the frequency of human track inspections was consistent with the public interest and in accord with the statute. The Agency just said the reduced frequency of inspections it was allowing was the most common during the test programs, although there was no documentation for that assertion or showing that when frequencies are reduced to the allowed level there would be no adverse effect on rail safety. J.A. at 216. Furthermore, BMWED demonstrated that data from the test programs showed the participating railroads reduced the frequencies of human track inspections only by about 15% to 25%. J. A. at 164, 204. So even if it could be shown that safety was not diminished during the test programs, experience under the test programs was not that frequencies of human inspections were reduced by 50%. And while FRA did not allow the railroads to wait 48 or 72 hours to remedy defects found by the machines, the Agency did not explain why it was consistent with rail safety to allow a detected defect to remain unaddressed not just for 24 hours, but for 24 hours after a Track Inspector has been dispatched to the site and verified the defect, when the Track Safety Standards require that

defects found by Track Inspectors must be immediately remedied. 49 C.F. R. §213.233(d).[3]

Accordingly, to the extent an explanation was provided by the FRA, it was not to provide a rationale for granting the waiver, only to explain why the waiver request was not granted in full, and even then the explanation provided was just a conclusory statement, not a reasoned explanation.

As BMWED has shown, for the decision of an agency to be sustained, the agency must show that it has "examine[d] the relevant data, and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made" (*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm, supra.,* 463 U.S. at 43); to withstand review, an agency's decision must provide a "reasoned explanation" for the conclusion it reached (*Golden Living Ctr. v. HHS*, *supra.,* 832 Fed. App'x at 974)); and "a conclusion accompanied by 'no

[3] BMWED also explained that the delay in remediation would be more than just the lapse of time between machine detection and Track Inspector verification and remediation; that the problem is exacerbated by the reduction in the frequency of human track inspections. J.A. at 40-42. That compound problem remains even with FRA's modifications to AAR's proposal. For example, with once-a-week human inspections, once-a-month machine inspections, and the allowance for a delay for verification and then 24 hours for remediation, human inspections might occur on the 3rd, 10th, 17th, and 24th days of a month with a machine inspection occurring on the 14th. In that scenario, a defect that occurred on the 5th would not be seen and remedied until the 10th, a defect that occurred on the 19th would not be seen and remedied until the 24th, and a defect detected by a machine on the 14th would not be seen and remedied until the 17th at the earliest. With twice-a-week human inspections, there is a much greater probability that a defect will be detected and remedied sooner, and before it becomes more hazardous.

explanation; is the epitome of 'arbitrary and capricious decision-making'" *(Environmentel, LLC v. FCC, supra.,* 661 F. 3d at 84-85). Here, FRA's decision fails to satisfy the requirements of the Hobbs Act and the Administrative Procedure Act.

Unfortunately, this is not an isolated instance of FRA decisionmaking unsupported by a reasoned explanation. As shown above, the D.C. Circuit directed FRA to reverse its decision allowing railroads to certify engineers and conductors employed by a foreign affiliate under a less stringent training curriculum than required for American engineers and conductors because FRA only provided conclusory statements that the new program complied with existing FRA requirements. *Brotherhood of Locomotive Engineers v. Fed. R.R. Admin.*, *supra.,* 972 F.3d at 116-17. The Court found that the Agency provided "no reason – not one word – in the administrative record for the Railroad Administration's material and consequential decisionmaking on important matters of railroad safety." *Id.* at 117. And in vacating FRA's decision denying BNSF's request to expand the scope of a previously granted waiver as to the required frequency of human track inspections in deference to the RSAC's deliberations, the 5th Circuit held the denial of expansion of the waiver was arbitrary and capricious because the agency "barely articulated any basis at all" for its decision, and the Court found the "paucity of reasoning … especially glaring in the face of the agency's statutory mandate to

prioritize safety." *BNSF Ry. v. Fed. R.R. Admin.*, *supra.,* 62 F.4th at 908. In the instant case, the FRA has once again made a decision with significant consequences for rail safety without providing a reasoned explanation for its decision, despite the statutory directive that the Agency make safety its highest priority. Like those other FRA decisions, FRA's decision allowing the industry-wide waiver should be overturned as arbitrary and capricious for lack of provision of a reasoned explanation of the decision.

**E. FRA's Decision Should Be Vacated as Arbitrary and Capricious Because the Agency Failed to Address Significant Facts and Arguments Raised by BMWED**

As is described above, and is shown in greater detail in BMWED's comments and rebuttal to AAR's supplemental filing, BMWED provided substantial evidence and argument as to why reducing the frequency of human track inspections was not consistent with rail safety or in the public interest because the machines cannot detect non-track geometry defects, cannot assess multi-factor conditions that might not individually be defects but cumulatively constitute unsafe conditions, and cannot effect immediate remediation of defects, which is required of Track Inspectors. BMWED also responded to AAR's supplemental filing in which the railroads argued that non-track geometry defects would ultimately result in track geometry problems that would be detected by the machines, and that broken rails are rare and usually detected by the signal system.

BMWED showed that non-track geometry defects do not immediately cause machine-detectable track geometry defects, and that with human track inspections reduced, non-geometry defects could develop and not be detected until they become severe, meaning that actual non-track geometry defects could not be detected for days and not be remedied in as timely a manner as they would be with regular human track inspections. J.A. at 158-159, 197-199. BMWED demonstrated that signal systems do not detect every broken rail, that broken rails in "dead zones", like switches, are not at all detectable by signal systems, and that the Track Inspector declarations showed that they frequently detect and remedy broken rails. J.A. at 159-160, 171-174, 200-201. Despite BMWED's substantial evidence on these points raising serious safety concerns about reduced frequencies of human track inspections, and the disputed assertions of BMWED and AAR on these points, FRA did not mention, much less grapple with any of them.[4]

A number of the Track Inspectors also stated that they have inspected track

[4] BMWED submits that it is significant that its substantial body of evidence and commentary was in the form of declarations from Track Inspectors who are certified by the railroads to be responsible for track safety, and who provided concrete examples of the capabilities and deficiencies of the machines and asserted that they would be endangered by reductions in the frequencies of their inspections. Their evidence and arguments were not refuted by anyone, and not rejected or explained away by FRA. AAR offered no statements from any managers or department heads with actual maintenance of way experience to rebut the Track Inspector declarations. J.A. at 100-153. And FRA itself did not in any way engage with the evidence and opinions of these experienced and expert workers. J.A. at 207-218.

after the track had been traversed by track geometry machines and the Inspectors found defects that were missed by the machines. Some of those Inspectors provided photographs showing defects missed by the machines. J.A. at 27-29, 60-160, and 171-174. AAR had no response to those declarations, and FRA did not even bother to engage with that evidence.

BMWED also addressed experience of the railroads during the test programs which was heavily relied on by AAR and cited by the FRA in its decision. J.A. at 216. BMWED showed that in none of the tests were the human inspections reduced to the level sought by AAR. J.A. at 31-32, 69-71, and 169-170. While FRA did not grant the railroads the 75% reduction in human inspections they requested, and instead allowed a 50% reduction, with further reduction possible depending on experience under the waiver, BMWED demonstrated that during the tests, the participating railroads as a group only reduced the frequencies of human track inspections from about 15% to 25%. J.A. at 164, 204. So, despite giving the impression of deliberating over the appropriate frequency of reduced human track inspections and denying the railroads the full reduction they sought, FRA completely failed to engage with BMWED's showing that during the test programs track inspections were not reduced to the level that the FRA's waiver allows.

A major argument of AAR in support of its petition was the assertion that the waiver would enhance rail safety by reducing Track Inspector time on the

tracks and exposure to injury. J.A. at 7, 107. But BMWED showed that AAR offered no data from the tests programs demonstrating improved safety of Track Inspectors during those tests (J.A. at 33, 72-75, 167-169); that because Track Inspectors are track workers, if they are assigned to verifying possible defects identified by the machines, they will still be on the tracks as Track Inspectors or performing other maintenance of way work, just at other locations (J.A. at 33, 72-75, 168); that when the Inspectors follow proper protocols, and the railroads adhere to those protocols, the Inspectors should not be unsafe on the tracks (J.A. at 33-34, 168); and that the Track Inspectors themselves do not believe that their work is inherently unsafe or that reducing the frequency of their track inspections will make them more safe at work, rather they think that as track workers, their safety would be diminished if the frequency of human track inspections was reduced (J.A. at 33-35, 72-75). Once again, FRA did not respond to, or in any way engage with, BMWED's evidence and arguments on this point which was heavily relied

on by AAR in seeking the waiver.[5]

FRA also failed to engage with BMWED's arguments that reducing the frequency of human track inspections and substituting once a month machine inspections would mean that defects would not be found and remedied for relatively long periods of time, because not only would there be a delay between machine detection of a defect and verification and remediation of that defect, the reduction of frequency of human track inspections and substitution of monthly machine inspections would mean that a defect could exist for more than a week before being remedied. J.A. at 40-42, 66-67. FRA did not address this problem in any way. While the agency's decision did not allow the railroads to go to twice a month human inspections, and did not allow up to 72 hours for remediation of defects detected by the machines, FRA never grappled with the consequences of

[5] Over the course of eight years, three FRA decisions and two appellate court decisions regarding reductions in the frequency of human track inspections, the railroads repeatedly argued that the reductions would enhance the safety of Track Inspectors. But, over all that time and litigation, not a shred of evidence was offered in support of that assertion, only the supposition that less time on the tracks means less exposure to injury; as opposed to actual evidence of a decline in injury rates. In its Decision, FRA advised the railroads that they could collect data on reduction in injuries, but that they must "propose and define a metric to quantify this potential benefit" and submit that to FRA, but that collection and reporting of such data is optional. J.A. at 213, 217. If any railroad develops such metrics and submits data on Track Inspector injuries, it would be the first time FRA would have any information on an argument the railroads have repeatedly advanced over the years as supporting a finding that reduced human inspections are consistent with rail safety.

simultaneously reducing the frequency of human track inspections and allowing up to 24 hours after defect verification for the railroad to effect a remedy, when the regulations provide for twice weekly human track inspections with inspectors required to immediately remediate any defects they find, and the statute requires that FRA make safety its highest priority.

As is explained above, an agency decision should be vacated as arbitrary and capricious if the agency has ignored crucial facts in the record or arguments raised by parties. *Motor Vehicle Mfrs. Ass'n v. State Farm, supra.,* 463 U.S. at 48; *BNSF Ry v. Fed. R.R. Admin.*, 105 F.4th 691, 700 (5th Cir. 2024); *Cincinnati Bell v.* FCC, *supra.,* 69 F.3d at 761; *Kakar v. U.S. I.C.&E , supra.,* 29 F. 4th at 134; *Mfrs. Ry. Co. v. Surface Transp. Bd.*, *supra.,* 676 F.3d at 1097; *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1051 (D.C. Cir. 2002). Here FRA failed to engage in multiple substantial and substantially documented arguments advanced by BMWED, so the Agency's decision should be vacated on that basis.

**F. FRA's Decision Should Be Vacated as Arbitrary and Capricious Because the Permitted Delay in Remediation of Defects is Contrary to FRA's Own Regulations**

An FRA regulation requires that if a Track Inspector "finds a deviation from the requirements of this part, the inspector shall immediately initiate remedial action". 49 C.F.R. §213.233(d). The regulation recognizes the importance of immediate remediation of defects because of the potential consequences if trains

traverse substandard track. But, under the waiver, FRA has authorized delays in remediation when the defect is detected by a machine, both in the time involved for human verification of the defect, and then an additional 24 hours after human verification. But, as noted above, there is also additional delay as a result of reducing the frequency of human inspections from twice a week to once a week, and only adding once monthly machine inspections. This means that a defect that would have been seen and immediately remedied by a Track Inspector, might go several days before detection, and then the railroad would have another 24 hours to remedy the problem. BMWED submits that FRA's decision eliminating certain human track inspections and allowing additional time for remediation of a defect found by a machine is contrary to the Agency's own regulations. As this Court held in *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004), "it is an elemental principle of administrative law that agencies are bound to follow their own regulations.". *See also, Nat'l Envt'l Dev. Ass'n's Clean Air Project v. EPA*, *supra.,* 752 F. 3d at 1009; *Environmentel v. FCC, supra.,* 661 F. 3d at 85. FRA's decision should therefore be vacated as in conflict with the Agency's own

regulations.[6]

## VII. CONCLUSION

For the foregoing reasons, BMWED respectfully submits that the FRA's decision should be vacated as arbitrary and capricious and contrary to law.

Respectfully submitted,

*/s/ Richard S. Edelman*
Richard S. Edelman
Mooney, Green, Saindon, Murphy & Welch, P.C.
1620 Eye Street NW, Suite 700
Washington, DC 20006
(202) 783-0010
REdelman@mooneygreen.com

June 15, 2026

[6] In its Comments, BMWED noted (J.A. at 43-45, 72-75) that when this argument was raised in the D.C. Circuit case regarding the BNSF pilot program, FRA argued that there would be no violation of Section 213.233(d) because, by its terms, it requires immediate remediation by a "person" that finds a defect, and a machine is not a "person"; so instead the general mandate for a railroad to adequately maintain its infrastructure would govern. FRA Brief in *BMWED v. BNSF*, D.C. Cir. Case No. 19-1048 at 29-30. Of course, the requirement for immediate remediation after a "person" finds a defect was adopted when inspections were only being performed by "persons". The notion that leaving a defect unremedied for a day or days is acceptable because the defect was not detected by a "person" but instead by a machine in lieu of a "person" is at odds with the entire point of the inspection regime, the remediation requirement, the statutory directive that waivers must be consistent with rail safety, and the basic mission of the Agency.

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused copies of the forgoing Brief of the Brotherhood of Maintenance of Way Employes Division/IBT to be served by on the following by using the appellate CM/ECF system:

David I. Peters
Steven A. Myers
Attorneys, Appellate Staff
Civil Division
U.S. Department of Justice
950 Pennsylvania, Ave,. N.W.
Washington, D.C. 20530
david.l.peters@usdoj.gov
steven.a.myers@usdoj.gov

Thomas H. Dupree, Jr.
John S. Acton
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
tdupree@gibsondunn.com
jacton@gibsondunn.com

June 15, 2022

*<u>/s/Richard S. Edelman</u>*
Richard S. Edelman

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that the foregoing brief of the Brotherhood of Maintenance of Way Employes Division/IBT ("BMWED") complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 11,089 words, as counted by the Microsoft WORD word-processing software.

Respectfully submitted,

*/s/ Richard S. Edelman*

June 15, 2026

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused copies of the forgoing Brief of the Brotherhood of Maintenance of Way Employes Division/IBT to be served by on the following by using the appellate CM/ECF system:

David I. Peters
Steven A. Myers
Attorneys, Appellate Staff
Civil Division
U.S. Department of Justice
950 Pennsylvania, Ave,. N.W.
Washington, D.C. 20530
david.l.peters@usdoj.gov
steven.a.myers@usdoj.gov

Thomas H. Dupree, Jr.
John S. Acton
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
tdupree@gibsondunn.com
jacton@gibsondunn.com

June 15, 2022

*<u>/s/Richard S. Edelman</u>*
Richard S. Edelman

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I hereby certify that the foregoing brief of the Brotherhood of Maintenance of Way Employes Division/IBT ("BMWED") complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 11,089 words, as counted by the Microsoft WORD word-processing software.

Respectfully submitted,

*/s/ Richard S. Edelman*

June 15, 2026

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused copies of the forgoing Brief of the Brotherhood of Maintenance of Way Employes Division/IBT to be served by on the following by using the appellate CM/ECF system:

David I. Peters
Steven A. Myers
Attorneys, Appellate Staff
Civil Division
U.S. Department of Justice
950 Pennsylvania, Ave,. N.W.
Washington, D.C. 20530
david.l.peters@usdoj.gov
steven.a.myers@usdoj.gov

Thomas H. Dupree, Jr.
John S. Acton
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
tdupree@gibsondunn.com
jacton@gibsondunn.com

June 15, 2022

*<u>/s/Richard S. Edelman</u>*
Richard S. Edelman

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that the foregoing brief of the Brotherhood of Maintenance of Way Employes Division/IBT ("BMWED") complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 11,089 words, as counted by the Microsoft WORD word-processing software.

Respectfully submitted,

*/s/ Richard S. Edelman*

June 15, 2026